

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
03/18/2014

| | | |
|---|---|---|
| IN RE: | § | |
| ROYCE G. BINNION, JR.; dba RRJ HOT | § | CASE NO: 13-30234 |
| SHOT AND DIRT WORK | § | |
|   Debtor(s) | § | |
| | § | CHAPTER 13 |

### MEMORANDUM OPINION

For the reasons set forth below, this case is dismissed with prejudice against refiling for 180 days.

### Background

On January 18, 2013, Royce Binnion, Jr. filed his voluntary chapter 13 petition. ECF No. 1.  On January 31, 2013, National Oilwell Varco, L.P. filed its motion for relief from stay in order to proceed with a state court action against Mr. Binnion.  ECF No. 16.  NOV's state court suit relates to alleged fraud committed by Mr. Binnion while he was employed by NOV. At the February 15, 2013 hearing on the motion for relief from stay, the Court entered its Order Regarding Claims of National Oilwell Varco, L.P.  ECF No. 34.  The Order held in pertinent part that for purposes of any adversary proceeding brought pursuant to § 523 or § 1328 or § 727 of the Bankruptcy Code:

- NOV had a $5,366,284.22 liquidated claim against Mr. Binnion, broken down as follows:
    - $742,916.53 arising out of the B&L Supplies matter;
    - $271,792.29 arising out of the Navasota Industrial Supply matter;
    - $292,740.12 in attorney's fees through December 31, 2012; and
    - $4,058,835.28 in punitive damages.

- Mr. Binnion did not stipulate that he actually engaged in any wrongful conduct and the Court made no finding of wrongful conduct;

- The automatic stay was lifted to allow entry of a judgment against Mr. Binnion in the form attached to the Order as Exhibit A (s*ee* ECF No. 34-1).

ECF No. 34.

**Procedural Background**

On March 18, 2013, the Chapter 13 Trustee, David Peake, filed his Amended Motion to Dismiss or Convert. ECF No. 47. Mr. Peake's motion argued that Mr. Binnion's bankruptcy should be dismissed because: (1) Mr. Binnion's non-contingent, liquidated, unsecured debts exceeded the statutory maximum of $360,475.00; (2) Mr. Binnion had not filed his federal income tax return for 2011; (3) Mr. Binnion failed to amend his Schedule I to reflect his employee income and deductions; and (4) Mr. Binnion failed to disclose all of his assets, including but not limited to, the ownership of two golf carts. ECF No. 47.

The evidentiary hearing on the Motion to Dismiss began on May 24, 2013 and was continued on May 28, June 11, September 3, September 4 and October 22, 2013. The Court permitted NOV to join in prosecuting the motion with respect to the issue of whether Mr. Binnion failed to disclose assets. NOV was not permitted to join in prosecuting the issue of whether Mr. Binnion met the requirements for a chapter 13 debtor.

Many of the allegations against Mr. Binnion have a common theme. Mr. Binnion allegedly purchased goods through Navasota Industrial Supply. The goods were billed to NOV, but were diverted to Mr. Binnion. Mr. Binnion denies that any of the items that he purchased from Navasota Industrial Supply were diverted to him. Mr. Peake alleges that the goods were diverted to Mr. Binnion. Accordingly, he concludes that Mr. Binnion failed to disclose either the diverted assets, or the proceeds from their disposition, in his bankruptcy.

Mr. Peake's first witness was Bradley Ortego, Investigations Manager for NOV. Examination of Mr. Binnion began on May 28 and continued on June 11. Mr. Binnion was recalled on October 22, 2014. At the October hearing, Mr. Binnion asserted his Fifth Amendment right against self-incrimination in response to every question asked by NOV's counsel. *See generally* Hearing Transcript, ECF No. 124.

Mr. Binnion has alleged that NOV falsified a case against him. He alleges a personal vendetta by an executive of NOV, and that others at NOV have left him as a scapegoat for their own wrongful conduct. *See* Hearing Transcript, ECF No. 95 at 34-42. At the close of the June 11, 2013 hearing, the Court determined that in order to ascertain whether Mr. Binnion's allegations against NOV should be given credence, it was necessary to subpoena witnesses from Navasota Industrial Supply.

The Court issued its Case Management Order calling as witnesses at a hearing set for September 3, 2013, Scott Stapp, Brett Donnahoe, and a person who is a records custodian for Navasota Industrial Supply of: (1) invoices to NOV and its affiliates; (2) invoices to and from Royce Binnion and his affiliates including RRJ Trucking; (3) email correspondence between Royce Binnion and Navasota; (4) billing records to and from NOV and its affiliates; and (5) billing records to and from Royce Binnion and his affiliates. ECF No. 91.

Between the June 11 and September 3 hearings, Mr. Binnion was indicted on first degree felony theft in Harris County. ECF No. 107 at 2. The charges directly relate to the NOV and Navasota Industrial Supply allegations. Mr. Binnion sought abatement of his bankruptcy case and all adversary proceedings in order to preserve his communication and testimonial privileges, and avoid any prejudice that might have resulted from continuing to prosecute the matters

pending before the Court.  ECF No. 107 at 2.  At the October 22 hearing, the Court orally denied Mr. Binnion's motion to abate.  Hearing Transcript, ECF No. 124 at 61.

Mr. Stapp testified at the September 3 hearing and Mr. Donnahoe testified at the October 22 hearing.

Mr. Peake and NOV submitted post-trial briefs on November 5, 2013.  ECF Nos. 125 & 126.  Mr. Binnion submitted his post-trial brief on November 19, 2013.  ECF No. 127.

**Suspicious Invoices**

Mr. Ortego began investigating Mr. Binnion after discovery of suspicious invoices from a supplier called B&L Supplies.  Hearing Transcript, ECF No. 93 at 7.  Mr. Ortego was suspicious of these invoices because they were all sequential, suggesting that NOV was B&L's only client.  Hearing Transcript, ECF No. 93 at 11.  Additionally, all of the invoices were for large amounts, but never more than $5,000.00—which also happened to be Mr. Binnion's signing authority limit.  Hearing Transcript, ECF No. 93 at 11.  Mr. Ortego also believed the invoices were suspicious based on the descriptions on the invoices.  Hearing Transcript, ECF No. 93 at 12.  For instance, there were invoices for forklift repairs, but NOV has a specific company that provides all of its forklift repairs.  Hearing Transcript, ECF No. 93 at 14.  There were also invoices for nine, fifty-five gallon drums of hydraulic fluid billed repeatedly every couple of weeks, but NOV facilities use only about five gallons of hydraulic oil per month.  Hearing Transcript, ECF No. 93 at 14.  Mr. Ortego subsequently discovered that Mr. Binnion was an owner of B&L.  Hearing Transcript, ECF No. 93 at 7.

Mr. Ortego went to the Highway 90 NOV Tuboscope facility where Mr. Binnion worked and questioned him about the invoices.  Hearing Transcript, ECF No. 93 at 14.  He asked Mr. Binnion to show him the supplies that were ordered on some of the more recent invoices, to

which Mr. Binnion claimed the supplies had been delivered to other facilities, but would not tell Mr. Ortego which facilities they were. Hearing Transcript, ECF No. 93 at 14.

Mr. Ortego also discovered suspicious invoices from Navasota Industrial Supply. Hearing Transcript, ECF No. 93 at 36. Mr. Ortego compiled a number of Navasota Industrial Supply invoices that he deemed to be suspicious and contacted Navasota to obtain supporting documentation for these invoices. Hearing Transcript, ECF No. 93 at 36-37. From the documentation he received, he concluded that many of the items from these invoices were sent to Mr. Binnion's home—he made this determination because the address on the invoices matched Mr. Binnion's address on record with NOV. Hearing Transcript, ECF No. 93 at 55-56.

When questioned about items being shipped to his home, Mr. Binnion testified that he had never taken or received possession of the items that were purportedly sent to his home address. Hearing Transcript, ECF No. 94 at 83.

Mr. Binnion testified that he had a personal account with Navasota, and that if he ever ordered anything from Navasota for his personal use it would have been billed to his personal account. Hearing Transcript, ECF No. 94 at 77. He testified that he would verbally communicate with Phillip or Scott Stapp to distinguish orders placed on behalf of NOV versus orders placed for his personal use. Hearing Transcript, ECF No. 95 at 10.

Navasota Industrial Supply denies that Mr. Binnion ever had a personal account with them. Moreover, Mr. Binnion never made any personal payments to Navasota Industrial Supply. Mr. Binnion was being untruthful on this matter.

Mr. Stapp testified that he is familiar with how documents were kept by Navasota between 2008 and 2011 for invoices involving Royce Binnion and RRJ Trucking. Hearing Transcript, ECF No. 114 at 26. Mr. Stapp is familiar with how documents were kept related to

email correspondence between Mr. Binnion and Navasota.  Hearing Transcript, ECF No. 114 at 26.  Mr. Stapp is familiar with how documents are kept for billing records to and from NOV and its affiliates and billing records involving Royce Binnion.  Hearing Transcript, ECF No. 114 at 26.  Mr. Stapp testified regarding numerous Navasota invoices, and testified that each invoice was a true and accurate copy.  *See generally* Hearing Transcript, ECF No. 114.  Mr. Stapp testified regarding numerous emails between Navasota employees and Mr. Binnion, and testified that each was a true and accurate copy.  *See generally* Hearing Transcript, ECF No. 114.  Mr. Stapp testified regarding numerous Navasota credit card statements, and testified that each was a true and accurate copy.  *See generally* Hearing Transcript, ECF No. 114.

Both Mr. Stapp and Mr. Donnahoe testified that Mr. Binnion never had a personal account with Navasota.  Hearing Transcript, ECF No. 114 at 69; *see also* Hearing Transcript, ECF No. 124 at 9.  Mr. Donnahoe also testified that to his knowledge, there were no orders placed by Mr. Binnion that were not billed to NOV.  Hearing Transcript, ECF No. 124 at 24.  Mr. Stapp did not have any personal knowledge of whether any items were actually delivered to Mr. Binnion at his home, but he did not receive any complaint from Mr. Binnion that items were not received.  Hearing Transcript, ECF No. 114 at 66-67.

The Court will examine a few of the purportedly suspicious invoices in detail.

**Radarguns.com**

Creditor's Exhibit 57 consists of an email from Royce Binnion to Scott Stapp, a Navasota credit card statement, a Navasota invoice and packing slip to NOV Tuboscope, and invoices from Radarguns.com.  The invoices from Radarguns.com show that a radar gun, binoculars and a laser were purchased and shipped to Royce Binnion's home address.  The email from Royce Binnion to Scott Stapp is as follows, "We ordered from a company called Radar Guns, Total was

$4,589.79 add your mark up and split it into 2 invoices, bill it as closed circuit camera surveillance system. Any questions call me." Navasota's credit card statements show three payments to Radarguns.com in the amounts of $1,139.85, $1,249.99 and $2,199.95. The invoice to NOV shows that Navasota billed NOV $3,143.21 for a closed circuit camera surveillance system.

Mr. Stapp testified that the documents in Creditor's Exhibit 57 are true and accurate copies. Hearing Transcript, ECF No. 114 at 44-45.

Mr. Binnion testified that the address on the Radarguns.com invoice was his address, but that he never received or had possession of any of the items on the Radarguns.com invoices. Hearing Transcript, ECF No. 94 at 78-83.

At the time that these items were purchased, Mr. Binnion worked as a peace officer. The equipment that he allegedly purchased would have been useful to him in his capacity as a peace officer.

Mr. Binnion's testimony is not credible. He received these goods and failed to disclose them, or any proceeds from their disposition, to Mr. Peake.

**Nacogdoches Iron Works**

Creditor's Exhibit 61 consists of an invoice from Nacogdoches Iron Works for a 32' trailer, a purchase order from Wells Fargo to Navasota for the trailer, and invoices and packing slips to NOV for a 32' platform. The Nacogdoches Iron Works invoice totals $7,793.58 for a 32' trailer and accessories. The invoice indicates that the order should be shipped to Royce Binnion.[1] The purchase order from Wells Fargo is for a 32' platform for a total of $7,793.58. The two invoices to NOV both have a description of 32' platform in the amounts of $4,962.67 and $4,959.42.

---

[1] Mr. Binnion's address was not actually listed on the invoice.

Mr. Stapp confirmed that the documents in Creditor's Exhibit 61 were true and accurate copies. Hearing Transcript, ECF No. 114 at 57. Mr. Stapp testified that Navasota actually paid Nacogdoches for a thirty two foot trailer. Hearing Transcript, ECF No. 114 at 59. Mr. Stapp testified that the Nacogdoches invoice was paid at the direction of Mr. Binnion, but he had no personal knowledge of whether a thirty two foot trailer was actually delivered to Mr. Binnion. Hearing Transcript, ECF No. 114 at 60.

When asked whether he ordered a trailer from Nacogdoches Iron Works in June, 2010, Mr. Binnion testified that he had some recollection of being directed by his supervisor, Lloyd Charpentier, to order a trailer around that time. Hearing Transcript, ECF No. 94 at 86. Mr. Binnion testified that he did, in fact, order the trailer in Creditor's Exhibit 61, but never had possession of the trailer. Hearing Transcript, ECF No. 94 at 87.

Mr. Binnion testified that between January 2011 and the present he had several gooseneck trailers in his possession from time to time. Hearing Transcript, ECF No. 93 at 128. Mr. Binnion asserted that he did not own any of these trailers, but borrowed them from friends, and had permission from his supervisor at NOV to borrow one. Hearing Transcript, ECF No. 93 at 128. Mr. Binnion testified that after he was terminated from NOV, he relinquished the trailer that he borrowed from NOV to the Harris County Sheriff's Department because Mr. Charpentier accused Mr. Binnion of stealing the trailer. Hearing Transcript, ECF No. 94 at 91. Mr. Binnion testified that as of the petition date, he did not possess any gooseneck trailers. Hearing Transcript, ECF No. 93 at 128.

The evidentiary record is ambiguous as to whether the trailer was relinquished pre or post-petition. Accordingly, Mr. Peake has failed to sustain his burden of proof that Mr. Binnion failed to disclose the trailer in his bankruptcy. However, Mr. Binnion's testimony regarding the

trailer was not credible. At some point, he embezzled or stole the trailer, and at some point returned it. This conduct supports other allegations of the pattern of conduct resulting in Mr. Binnion's wrongful diversion of property.

### 2M Solutions, Inc.

Creditor's Exhibit 68 includes email correspondence between Mr. Binnion and Philip Stapp, a credit card statement for Navasota, a Navasota invoice and packing slip billed to NOV and an invoice from 2M Solutions. The invoice from 2M Solutions is for a safety vision patrol recorder for a total of $4,517.10. The invoice indicates that the order should be shipped to Philip Stapp and Royce Binnion and provides Mr. Binnion's home address. The email from Mr. Binnion to Philip Stapp says, "Just placed that order we discussed yesterday, Company is 2MCCTV, Total was 4517.10, Split into 2 invoices and Bill as 2 CCTV SC 7" Screen." The Navasota credit card statement shows that Navasota paid 2M Solutions $4,517.10. The invoice to NOV is in the amount of $3,175.09 with a description of CCTV SC 7" Screen.

Mr. Stapp testified that all of the documents in Creditor's Exhibit 68 were true and correct copies. Hearing Transcript, ECF No. 114 at 135. Mr. Stapp testified that this order was placed at Mr. Binnion's direction. Hearing Transcript, ECF No. 114 at 218. Mr. Stapp testified that he had no reason to believe that the order was not delivered to Mr. Binnion's address. Hearing Transcript, ECF No. 114 at 261.

Mr. Binnion's testimony is not credible. Mr. Binnion received these goods and failed to disclose them, or any proceeds from their disposition, to Mr. Peake.

### Overton Fisheries

Creditor's Exhibit 75 includes a Navasota credit card statement, email correspondence between Mr. Binnion and Scott Stapp and an invoice from Overton Fisheries, Inc. The Overton

Fisheries invoice is for Albino Catfish and Fathead Minnows for a total of $1,200.00. The invoice provides Mr. Binnion's home address as the "bill to" address. In the email correspondence between Mr. Binnion and Scott Stapp, Mr. Stapp asks Mr. Binnion, "Hey what do you want me to bill the $1,200 for at Overton Fish?" Mr. Binnion replies, "Bill me for something," to which Mr. Stapp responds, "Something it is." The Navasota credit card statement shows that Navasota paid Overton Fisheries $1,200.00. Although Creditor's Exhibit 75 does not include an invoice to NOV, Mr. Stapp and Mr. Donnahoe both testified that Mr. Binnion never had a personal account with Navasota, and all of Mr. Binnion's orders were billed to NOV. Additionally, Mr. Stapp testified that to the best of his knowledge, he put the order from Overton Fisheries on a previous bill. Hearing Transcript, ECF No. 114 at 151.

Mr. Stapp testified that the documents in Creditor's Exhibit 75 were true and accurate copies. Hearing Transcript, ECF No. 114 at 146.

Mr. Binnion testified that if he asked Navasota to bill him for the catfish, he asked them to bill his personal account. Hearing Transcript, ECF No. 94 at 78. The Court discounts Mr. Binnion's testimony. He had no personal account.

Moreover, whether purchased on credit, embezzled or stolen, Mr. Binnion received the fish. He then failed to disclose the fish, or any proceeds from their disposition, to Mr. Peake.

**Golf Cars of Conroe**

Creditor's Exhibit 87 includes email correspondence between Mr. Binnion and Philip Stapp, an invoice from Golf Cars of Conroe, a Navasota credit card statement and a Navasota invoice to NOV. The invoice from Golf Cars of Conroe shows that an EZ GO TXT golf cart (camo) was ordered.[2] The order also includes a lift kit, ten inch rims, flip seat, lights and several

---

[2] The invoice from Golf Cars of Conroe has an identical front and back side, it is not clear whether these are two separate invoices, each for one golf cart, or a duplicate of a single invoice. Additionally, the Navasota credit card

other accessories. The total for the order was $4,330.00. The invoice lists Mr. Binnion's home address. The email from Mr. Binnion to Philip Stapp says, "$4,330 x 2…Bill out as EZ8400EGC do not exceed 5K on invoice." The Navasota credit card statement shows that Navasota paid Golf Cars of Conroe $4,330.00 on November 12, 2010. The Navasota invoice to NOV Tuboscope provides a description of EZ8400EGC for a total of $4,979.50.

Mr. Stapp testified that the Navasota invoice for the golf carts was a true and accurate copy. Hearing Transcript, ECF No. 114 at 168. He testified that Navasota actually paid for the golf carts at Mr. Binnion's direction. Hearing Transcript, ECF No. 114 at 169. Navasota never received a complaint that the golf carts were not delivered. Hearing Transcript, ECF No. 114 at 169.

Mr. Binnion testified that he did, in fact, order golf carts from Golf Cars of Conroe, but that they were for NOV's use. Hearing Transcript, ECF No. 95 at 17. He said that there were several camouflage golf carts throughout NOV locations and that the particular golf carts in question were ordered at the direction of his supervisor, Lloyd Charpentier. Hearing Transcript, ECF No. 95 at 18. He testified that the lift kit and the camouflage were standard on the golf carts he ordered and that NOV did not specifically order camouflage golf carts, but merely ordered based on price. Hearing Transcript, ECF No. 95 at 20. He asserted that the golf carts he ordered for NOV should not have his address on the order. Hearing Transcript, ECF No. 95 at 20. He also testified that between January 2011 and the present he had been in possession of a golf cart that was borrowed from his father. Hearing Transcript, ECF No. 93 at 128-129. He testified that it was not a camouflage golf cart, and that as of the petition date he did not possess any golf carts. Hearing Transcript, ECF No. 93 at 128-129.

---

statement only shows payment for one golf cart in the amount of $4,330.00, and the invoice to NOV of $4,970.50 is not sufficient to cover two golf carts. However, the testimony and the email from Mr. Binnion refer to two golf carts being ordered.

Mr. Binnion's testimony lacks credibility. The Court concludes that Mr. Binnion ordered the golf carts for his own use. He failed to disclose them, or any proceeds from their disposition, to Mr. Peake.

**RRJ Trucking**

Mr. Binnion was the 100 percent owner of a business called RRJ Hot Shot Trucking and Dirt Work. Hearing Transcript, ECF No. 94 at 13-14. Mr. Binnion testified that he had no recollection of how much income he received from RRJ in the past five years, but that it had been over two years since he received any income from RRJ Trucking. Hearing Transcript, ECF No. 94 at 13-14. Mr. Binnion specifically testified that he had no recollection of doing any work through RRJ Trucking in 2011. Hearing Transcript, ECF No. 94 at 17.

Mr. Binnion testified that he never billed NOV for work by RRJ Trucking and never approved payment to RRJ Trucking by NOV. Hearing Transcript, ECF No. 95 at 22. When shown several invoices from RRJ Trucking that appeared to be initialed by Mr. Binnion, he testified that he did not remember approving those invoices. Hearing Transcript, ECF No. 95 at 23.

Mr. Stapp testified that at the direction of Mr. Binnion, he set up RRJ Trucking as a vendor with Navasota in 2011. Hearing Transcript, ECF No. 114 at 178. Additionally, in January, February and March, 2011, Mr. Binnion emailed Navasota and requested that it pay RRJ Trucking invoices and bill NOV. *See* Creditor's Exhibits 79-81. Mr. Stapp testified that NOV was, in fact, billed for the work on those invoices. Hearing Transcript, ECF No. 114 at 236.

No information on RRJ Tucking was provided in Section 18 of Mr. Binnion's Statement of Financial Affairs. The Court concludes that Binnion received compensation through RRJ

Trucking and has not disclosed the disposition of the compensation. Accordingly, the compensation must continue to exist as an asset, and the asset has not been disclosed.

**Loomis International**

At the October 22 hearing, counsel for NOV questioned Mr. Binnion about a $300,000.00 sexual harassment claim against his former employer, Loomis International. Hearing Transcript, ECF No. 124 at 79. NOV asked Mr. Binnion whether he sent a demand letter for $300,000.00 to Loomis on January 16, 2013. Hearing Transcript, ECF No. 194 at 79. Mr. Binnion invoked his Fifth Amendment right against self-incrimination in response to NOV's entire line of questioning regarding Loomis. *See generally* Hearing Transcript, ECF No. 124 at 71-85. No claim against Loomis was scheduled or otherwise disclosed by Mr. Binnion.

## Analysis

**Eligibility for Chapter 13**

As of Mr. Binnion's petition date, 11 U.S.C. § 109(e) provided in pertinent part that, "only an individual with regular income that owes, on the date of the filing of the petition, non-contingent, liquidated, unsecured debts of less than $360,475.00…may be a debtor under chapter 13 of this title."

At the May 24 hearing, the Court suggested that a creditor's claim could not be bifurcated into liquidated and unliquidated portions for eligibility purposes. Hearing Transcript, ECF No. 93 at 21. Upon further review, the Court determines that Fifth Circuit precedent allows a court to consider only the liquidated portion of a claim for determining chapter 13 eligibility. *See e.g. In re Nikoloutsos*, 199 F.3d 233, 237 (5th Cir. 1999) (court determined that liquidated compensatory portion of a judgment could be used for chapter 13 eligibility determination despite the fact that punitive portion of judgment had not yet been entered). However,

*Nikoloutsos* is not applicable to the present case because as discussed below, the Court does not find that any portion of NOV's claim was liquidated as of the petition date.

Mr. Peake argues that there need not be a formal evidentiary hearing or judicial decree in order for a claim to be deemed liquidated so long as the amount of the claim is readily ascertainable, such as by reference to a simple mathematical formula. *See e.g. NCI Building Sys. LP v. Harkness (In re Harkness)* 2006 WL 1880384, at *2 (5th Cir. July 7, 2006). The Court agrees that *Harkness* stands for the proposition that a debt may be considered liquidated if it can be easily ascertained using, for instance, simple arithmetic. However *Harkness* goes on to hold that debts based on tort are generally unliquidated unless and until resolved by judicial decree or otherwise fixed in some meaningful way. *Id*. The Fifth Circuit held that because the debtor in *Harkness* both objected to the proof of claim and contested each alleged instance of misappropriation, absent any formal evidentiary findings, the creditors misappropriation claims could not be precisely determined using simple arithmetic. *Id*. at *3.

Mr. Binnion listed NOV's unsecured claim on his original Schedule F as contingent, unliquidated and disputed, and listed the amount of the claim as unknown. ECF No. 11 at 15.

Mr. Peake argues that at the time of the filing of the petition, at least the compensatory damages of $742,916.53 for the B&L claim and $271,792.29 for the Navasota claim were liquidated, as they were certain amounts easily ascertainable using simple arithmetic. ECF No. 47 at 5. Mr. Ortego testified that he determined the amount of these two claims by simply adding up the totals of the suspicious invoices to B&L and Navasota. Hearing Transcript, ECF No. 93 at 7.

However, the claims against Mr. Binnion were tort claims, which at the time of filing, he disputed. In fact, at the hearing on NOV's motion to lift stay it was suggested that Mr. Binnion

intended to assert a wrongful termination counterclaim against NOV. Therefore, as of the petition date NOV's claim could not be determined by simple arithmetic because Mr. Binnion contested the fraudulent nature of each invoice.[3]

**Failure to Disclose Assets**

The Court will dismiss Mr. Binnion's case based on his failure to disclose assets.

A lack of good faith is considered cause under 11 U.S.C. § 1307(c) for which a court may dismiss a chapter 13 case. *In re Thalmann*, 469 B.R. 677, 681 (Bankr. S.D. Tex. 2012). Good faith is determined on a case-by-case basis by examining the totality of the circumstances. *Id*. The court may consider several factors, including whether there are any deficiencies or inaccuracies in the debtor's schedules or plan that might amount to an attempt to mislead the court. *Id*.

Based on the testimony of Mr. Ortego, Mr. Stapp and Mr. Donnahoe, there is overwhelming evidence that items were purchased by Navasota, billed to NOV and delivered to Mr. Binnion's home. Mr. Binnion alleged that he did not receive any of the items that were shipped to his home. Mr. Stapp verified the authenticity of the invoices which show delivery to Mr. Binnion's home address and confirmed that Navasota actually paid these invoices and billed NOV. Mr. Stapp confirmed that he never received a complaint from Mr. Binnion that items were not delivered to him. Although Mr. Binnion asserted that items he ordered through Navasota for personal use were ordered on his personal account, both Mr. Stapp and Mr. Donnahoe testified that Mr. Binnion never had a personal account with Navasota and that all of his orders were billed to NOV.

The evidence supports the conclusion that Mr. Binnion did, in fact, receive these items. The credible and consistent testimony of Mr. Ortego, Mr. Stapp and Mr. Donnahoe outweighs

---

[3] The Court does not suggest that *Harkness* stands for the proposition that all tort claims are inherently unliquidated.

Mr. Binnion's unsupported contention that he never received items at his home. Mr. Binnion provided no explanation as to why his home address was listed as the delivery address on the invoices if the items were not delivered to him, and provided no evidence as to where the items were delivered instead. Mr. Binnion testified that he does not have any of these items in his possession, but was unable to provide any information regarding where the items currently are, or how they were disposed of. Because the Court finds that Mr. Binnion did have possession of these items at some point in time, he is required to provide an explanation as to what happened to the items. Mr. Binnion's inability to provide any such explanation is sufficient proof that he has acted in bad faith by failing to disclose information relevant to the disposition of his assets.

Mr. Binnion also testified that RRJ Trucking had done no business within the two years preceding the petition date. However, there were Navasota invoices to NOV in 2011, approved by Mr. Binnion, for work performed by RRJ Trucking. This is evidence that RRJ Trucking had income in 2011 that should have been disclosed, yet Mr. Binnion failed to disclose any information regarding RRJ Trucking in Section 18 of his Statement of Financial Affairs.

Finally, when counsel for NOV questioned Mr. Binnion about a $300,000.00 sexual harassment claim against his former employer, Loomis International, Mr. Binnion invoked his Fifth Amendment right against self-incrimination in response to NOV's entire line of questioning regarding Loomis. It is well settled that the Court may draw an adverse inference from Mr. Binnion's refusal to testify in response to the Loomis line of questioning. *See e.g. Baxter v. Palmigiano* 425 U.S. 308, 318 (1976). Mr. Binnion's invocation of his Fifth Amendment right is probative of whether he failed to disclose his claim against Loomis. In light of the fact that Mr. Binnion proffered no evidence to refute the allegations and invoked his Fifth Amendment right

when asked about the claim, the Court accepts as true the allegations that Mr. Binnion failed to disclose his $300,000.00 claim against Loomis.

Mr. Binnion failed to disclose or account for hundreds of thousands of dollars in assets on his Schedules and Statement of Financial Affairs. Mr. Binnion was questioned at length regarding many of these assets and either answered untruthfully or invoked his Fifth Amendment right against self-incrimination. Mr. Binnion's lack of candor suggests that these omissions were intentional, and support a finding of bad faith conduct. Accordingly, Mr. Binnion's case is dismissed with prejudice against refiling for 180 days.

## Conclusion

The Court will enter an order consistent with this Memorandum Opinion.

SIGNED **March 18, 2014.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE